## 20661. HAYNES *v.* CANNON.

STEPHENS, J. 1. Where evidence has been excluded and a nonsuit granted, an assignment of error in the plaintiff's bill of exceptions, that "said refusal of the court to allow the testimony of [a witness named] and the order granting the motion for nonsuit [were] contrary to law and

. . not a sound exercise of the discretion of said judge, and the plaintiff had introduced sufficient evidence to carry the case to a jury, and the same was a question of fact for the jury to determine," is a sufficient assignment of error as to the judgment awarding a nonsuit. The motion to dismiss the bill of exceptions is therefore overruled.

2. Where a representation, made by the owner of a note, which he proposes to transfer without recourse in payment of the purchase-price of property, that the note is "as good as gold" and will be paid at maturity, is made for the purpose of inducing the owner to sell the property, and the owner acts upon the representation and sells the property and receives the note, indorsed "without recourse," as a payment on the purchase-price, the inference is authorized that the representation was intended by the person making it and was understood by the person to whom it was made as a representation as to the financial ability and integrity of the maker of the note.

3. Where a prospective purchaser of real estate offers in part payment on the purchase-price a series of promissory notes belonging to him, executed to him by a third person, and, in order to induce the sale, represents to the owner of the real estate that the notes were given for the purchase-price of personal property consisting of certain property installed in a hotel, and that the notes are "as good as gold" and will ·be paid, and offers to transfer them to the owner of the property without recourse, the consideration for the notes being the property installed in a hotel which the person making the offer had leased from the owner of the hotel who was the maker of the notes, the person making the offer giving as his reason for indorsing the notes without recourse that he is on too much paper already, and where the owner of the real estate accepts this offer and executes a contract of sale and makes a deed of the land to the person making the offer and accepts him as the purchaser of the land and puts him in possession, and accepts the notes indorsed without recourse as part of the purchase-price, but, before accepting this offer and executing the contract of sale and making the purchaser a deed to the land and putting him in possession, the owner of the land makes an investigation as to the value of the notes, by conferring with the maker, and where the only information received from the maker is a statement that he believes the notes are good and that he has in possession other notes from a person to whom he had sold the hotel and when he expects to pay the notes inquired about out of the collections made on the other notes, and the owner of the land, still believing the representation of the purchaser as to the value of the notes. and in reliance upon that representation, accepts the notes in part payment of the purchase-money for the land, and makes to the purchaser a deed to the land and puts him in possession, and where the notes so accepted are not paid and are not good, and the maker has no financial responsibility and is unable to pay the notes, the inference is not demanded as a matter of law that the seller discovered the falsity of the purchaser's representation, or could by the exercise of due care have discovered it, and that the owner of the land was not induced by the purchaser's representation to make the sale of the land and to execute a deed to the purchaser and to put him in possession. See *James* v.

*Crosthwait*, 97 *Ga.* 673 (25 S. E. 754, 36 L. R. A. 631), where it was stated that "It was not necessary, in order for the plaintiff to recover, that the deceit in question should have been the sole inducement which led him to make the investment. It was sufficient if it influenced his conduct materially."

4. Where the seller, after executing the contract of sale and putting the purchaser in possession of the land and placing the deed and notes in escrow for the purpose of refinancing a mortgage on the land, concluded, before refinancing the mortgage and while the deed and notes were still in escrow, that "these notes were suspicious," and found that there was no security behind them, and expressed an intention not to go on with the trade, and where, during this period the maker of the notes, with money furnished him by the purchaser for this purpose, without the seller's knowledge, offered to pay the seller one of the notes which had become due, it does not appear from this conclusively and as a matter of law that the seller, before he refinanced the loan and the papers were taken from escrow, discovered the alleged fraud of the purchaser in the representation as to the notes, or that the seller could, in the exercise of due care, have discovered this fraud.

5. After the execution of the deed and the placing of it and the notes in escrow to be there held until the seller could refinance the mortgage which he had upon the property, the contract of sale, as respects the seller's undertaking to execute a deed and deliver possession of the property, was executed, and the seller could not, by a rescission of the contract and a refusal to perform, retake possession of the land and thereby put himself in a position where he would suffer no loss. Therefore, where, after the execution of the contract of sale and the placing of the purchaser in possession of the property and the placing of the deed and notes in escrow, and before the deed and notes were taken from escrow and the contract was finally executed by a refinancing of the loan and a delivery of the deed to the purchaser and of the notes to the seller, the latter discovered the fraud of the purchaser in the representation as to the notes, it does not thereby appear conclusively and as a matter of law that the failure of the seller then and there, upon a discovery of the fraud, to rescind the contract on account of the fraud, and not the fraud of the purchaser, was the cause of the seller's loss.

6. Any statement made by the seller to others that the notes were not good and that he did not intend to go on with the trade is a statement in the nature of an admission only as to knowledge on his part as to the existence of the alleged fraud, and is not evidence which conclusively and as a matter of law establishes as a fact that he at the time had such knowledge. The probative value of such statement as tending to show such knowledge is a question of fact for the jury.

7. Where the purchaser was unwilling to transfer the notes except without recourse, and was acquainted with the maker of the notes and knew that they had been given for the payment of the purchase-money for certain hotel equipment which the purchaser, while a lessee of a hotel owned by the maker, had placed in the hotel, and the purchaser had transferred this property to the maker of the notes and had taken no security, and where at the time of the execution of the notes the maker

had, with the knowledge of the purchaser, transferred the property which was the consideration of the notes to another person, and had taken this latter person's notes therefor, and where no security was taken for the notes, and nothing was behind the former notes except the assets of the maker, and he had no assets except the notes taken by him on the sale of the hotel, all of which the purchaser knew, and where after the deed and notes had been placed in escrow and before they had been taken from escrow the purchaser furnished to the maker of the notes money for the purpose of being paid to the seller in payment of the first of the series of notes which had become due, and where, after the seller had refinanced the loan and the papers had been taken from escrow, the maker of the notes refused to pay them on demand of the seller and stated that he would not pay them and could not pay them, the inference is authorized that when the purchaser of the land represented to the seller that the notes were good and would be paid, the maker of the notes was insolvent and financially irresponsible, and that the notes were not good and were not going to be paid, and the inference is further authorized that the purchaser, when he offered the notes to the seller on the purchase-price of the land and represented to the seller that the notes were "as good as gold" and would be paid, knew that this representation was not true and that the notes were not good and would not be paid, and that the maker of the notes was financially irresponsible.

8. This being an action for deceit by the seller against the purchaser, to recover for damage alleged to have been sustained by the plaintiff as a result of loss occasioned to the plaintiff by the alleged fraud of the purchaser in representing that the notes given to the plaintiff in part payment of the purchase-price of the property sold were good and would be paid, when in fact the notes were not good and the purchaser knew it, the evidence adduced in behalf of the plaintiff was sufficient to authorize a verdict for the plaintiff, and it was error to grant a nonsuit.

*Judgment reversed. Jenkins, P. J., concurs. Bell, J., dissents.*

DECIDED FEBRUARY 28, 1931.

*George & John L. Westmoreland, J. M. Jones,* for plaintiff.

*Colquitt, Parker, Troutman & Arkwright, G. N. Bynum,* for defendant.

BELL, J., dissenting. I am constrained to dissent from the judgment of reversal, for two reasons: first, because I think the evidence shows as a matter of law that the plaintiff did not *rely* upon any representation which the defendant may have made to him regarding the value and collectibility of the notes. On the other hand, it affirmatively appears from the evidence that the plaintiff, before he signed any sort of contract, concluded to make an independent investigation with regard to the same subject. Upon this question

he testified as follows: "After I had my conversation with Mr. Cannon [the defendant] and Mr. Williams [the broker] in regard to these notes, the value of them and so forth, I made further investigation in regard to these notes. When Mr. Williams and I went to see Mr. Morrison [who had signed the notes as president of the Acme Investment Company, the maker] —prior to signing the contract Mr. Williams and I went to see Mr. Morrison and asked him about the notes. Mr. Morrison told us he believed the notes were good, that he had some notes in his possession from the man he had sold the Georgian Hotel to, payable to him, $2,000 a month, and out of that money he was going to pay these notes of $500 a month. . . When I got these notes in hand and examined them I went to see Mr. Morrison. I did see Mrs. Morrison in there. She was in the office. I talked to her about the Acme Investment Company. I asked her about the Acme Investment Company there, what it was, before I signed the contract. I was trying to get a line on the notes. *I was making an investigation into these notes for myself. I made that investigation.* I can not say that was before I talked to Mr. Cannon. It was about the same time. Mrs. Morrison told me what these notes represented in substance. She told me about some notes given by Cunningham. She told me that the Acme Investment Company got over $200,000 of notes from Cunningham for the Georgian Hotel at Athens, payable $2,000 a month. Mr. Morrison came in on another visit and told me substantially the same thing. On two separate occasions Mrs. Morrison told me and Mr. Morrison that they had some notes from Cunningham, and that they represented the sale of the Georgian Hotel in Athens, and all about that. They told me their notes were good too. He told me their notes were good, or she did. He told me the Acme Investment Company notes would be paid. They said there was an agreement. I asked about that agreement after I got the notes, several days after. I went to the title company on the 12th of February to close this trade with Mr. Cannon [italics ours]."

There is no evidence that the plaintiff was referred to the Morrisons by the defendant, but it appears that he went of his own volition, desiring to make an investigation "for himself." One of the essentials of a cause of action for fraud is that the plaintiff shall have relied upon the representations in consummating the con-

tract, and it seems to me that the evidence failed as a matter of law to establish this necessary element. Compare *King* v. *Holt,* 31 *Ga. App.* 795 (122 S. E. 95); *Sawyer* v. *Birrick,* 33 *Ga. App.* 746 (127 S. E. 806); *Davis* v. *State,* 27 *Ga. App.* 195 (3) (107 S. E. 883); *Currie* v. *Collins,* 136 *Ga.* 473 (2) (71 S. E. 798). "If the purchaser investigates for himself and nothing is done to prevent his investigation from being as full as he chooses, he can not say that he relied on the vendor's representations." Farrar *v.* Churchill, 135 U. S. 609, 615 (10 Sup. Ct. 771, 34 L. ed. 246).

Secondly, I am of the opinion that the evidence established without dispute that the plaintiff waived the alleged fraud by proceeding to close the transaction after knowledge that the notes were of questionable value, or after the discovery of such facts as should have led an ordinarily prudent person to the acquisition of such knowledge. After the execution of the escrow agreement the plaintiff, according to his own testimony, concluded that the "notes were suspicious," and began "to feel that they were not good." He had employed an attorney to make an investigation, and this attorney had gone to Athens for the purpose, just as the plaintiff himself had done on two different occasions in order to interview the Morrisons. The attorney discovered that the notes were without security, and for this reason, so the plaintiff says, he began to doubt that the notes were good.

Notwithstanding this state of mind on his part, he proceeded to clear the title as demanded by the defendant's attorney, by arranging to segregate the property from an omnibus mortgage so that the defendant might assume a particular amount in part satisfaction of the purchase-money. He also accepted from the depositary a remainder of the notes, which were held with the deed in escrow pending clearance of the title to the extent required.

In these circumstances, I think that the plaintiff should be held to have waived the fraud, since by further action on his part he made possible the delivery of the deed and the notes, in accordance with the escrow agreement, himself receiving the remaining and greater portion of the notes in part and final payment of the purchase-price. The plaintiff added materially to his entanglement after the discovery of facts which should have put him fully upon notice of the alleged falsity of the representations, and in such a case he is not entitled to redress at the hands of the court. *Tuttle*

v. *Stovall,* 134 *Ga.* 325 (67 S. E. 806, 20 Ann. Cas. 168); *Richardson* v. *DuPree,* 32 *Ga. App.* 3 (5 b) (122 S. E. 707); Kingman v. Stoddard, 85 Fed. 745; Simon v. Goodyear Metallic Rubber Shoe Co., 105 Fed. 579.

For the above reasons, regardless of others that may appear in the record, including a possible failure to show that the representations were known by the defendant to be false, it is my opinion that the judgment of nonsuit was right, and should be affirmed.